**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA JEAN CASTLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 09 C 3826** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Judge Sheila Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa Jean Castle seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment. On April 26, 2010, the case was reassigned to this Court for all further proceedings. After careful review of the record, the Court now denies Plaintiff's motion and affirms the Commissioner's decision.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on October 19, 2005, alleging that she became disabled on April 15, 2005 from depression, a heart attack, hardened arteries and a heart stent. (R. 95-99, 119.) The Social Security Administration ("SSA") denied the application initially on June 21, 2006, and again on reconsideration on November 1, 2006. (R. 51-57, 53-60, 61-64.) Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") John K. Kraybill held an administrative hearing on November 4, 2008. The ALJ heard testimony from Plaintiff, who appeared with counsel, and from vocational expert ("VE") Edward F. Pagello,

and medical expert ("ME") Sheldon J. Slodki, M.D.  A little more than two weeks later, on November 21, 2008, the ALJ found that Plaintiff is capable of performing the full range of sedentary work and, thus, is not disabled under Rule 201.25 of the Medical-Vocational Guidelines (the "Grid").  (R. 8-14.)  The Appeals Council denied Plaintiff's request for review on April 20, 2009, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  (R. 1-3.)

In support of her request for a remand, Plaintiff argues that the ALJ erred by failing to order a consultative examination.  For reasons discussed below, the Court rejects this argument.

## FACTUAL BACKGROUND

Plaintiff was born on August 14, 1964, and was 44 years old at the time of the ALJ's decision.  (R. 117.)  She has a tenth grade education, and worked for approximately 20 years as an apheresis technician drawing blood from people (*i.e.*, phlebotomist).  (R. 120, 124.)  She stopped working in April 2005.

### A.  Medical History

#### 1.  2002 through 2004

Plaintiff suffered a heart attack in 2002 and underwent angioplasty and stenting on April 2 of that year.  (R. 186, 199.)  She reported feeling better on May 8, 2002, and a June 4 stress echocardiogram ("stress test") was unremarkable.  (R. 186, 197, 206.)  On October 3, 2002, Plaintiff saw Dr. Abbas A. Khawaja for chest pain lasting three to five minutes per episode.  Dr. Khawaja conducted a physical examination, which was unremarkable, and noted that Plaintiff continued to smoke despite "significant risk factors."  He diagnosed

coronary artery disease ("CAD"), hypertension and hyperlipidemia, and recommended that she have a repeat stress test with echocardiogram. (R. 196-97.) The October 8, 2002 stress test was normal. (R. 205.)

Plaintiff continued to complain of chest pain, palpitations and shortness of breath in May 2003, and on September 12, 2003, Dr. Khawaja ordered another stress test. (R. 194-95.) The September 19, 2003 test was normal, with only "[m]ildly reduced functional aerobic capacity for patient's age." (R. 204.) Despite these normal findings, Plaintiff returned to Dr. Khawaja in February 2004 complaining of high blood pressure. (R. 193.) Shortly thereafter on March 29, 2004, Plaintiff had a left heart catheterization, LV (left ventricular) angiography and coronary angiography. The test showed 50% stenosis in the middle part of the right coronary, but was otherwise unremarkable. (R. 207-08.) At an April 7, 2004 follow-up visit with Dr. Khawaja, Plaintiff reported always experiencing some shortness of breath, but denied having chest pains or swelling. Dr. Khawaja told Plaintiff to see him again in six months. (R. 192.)

Plaintiff next received medical treatment on September 13, 2004, when she reported to the Rush-Copley Family Practice Residency ("Rush-Copley") with nausea and heartburn lasting two months, and high blood pressure. The doctor advised her to quit smoking and to follow up with her cardiologist. At the time, Plaintiff's medications included Prevacid (for heartburn), Toprol (a beta-blocker), Plavix (to prevent blood clots), and Zocor (for cholesterol). (R. 171.) The following month, on October 6, 2004, Plaintiff saw Dr. K.G. Chua at Fox Valley Cardiovascular Consultants ("Fox Valley"), because of chest discomfort and hypertension. Plaintiff said that she had been experiencing central chest discomfort "on and off" for the previous month, each episode lasting approximately 5 minutes and

3

improving with nitroglycerin. (R. 199.) Dr. Chua noted Plaintiff's March 29, 2004 angiogram results, which showed a "50% mid right stenosis which was non-critical," but no "LAD [left anterior descending] in-stent restenosis" and "normal LV function." (*Id.*) He increased Plaintiff's dosage of Hyzaar (for hypertension), and indicated that she would need another stress test with Dr. Khawaja once her blood pressure returned to a normal level. (*Id.*)

### 2. 2005 through 2006

On January 6, 2005, Plaintiff had another stress test at Fox Valley. The results were entirely normal. (R. 238-48.) Approximately four months later, on April 6, 2005, Plaintiff presented to Rush-Copley with shortness of breath. An EKG showed no acute changes and a chest x-ray was unremarkable with "[n]o acute process." (R. 169, 175-76.) The doctor diagnosed shortness of breath, history of CAD, hypertension, hyperlipidemia, and gastroenteritis, and referred Plaintiff to Dr. Khawaja for further treatment. (R. 169.) Plaintiff saw Dr. Khawaja on April 15, 2005. She denied having any chest pain at that time and admitted that she still smoked a pack of cigarettes per day. Dr. Khawaja conducted a physical examination, which he described as "totally unremarkable," refilled Plaintiff's prescriptions, and made no further recommendations. (R. 180, 198).

On April 20, 2005, a doctor at Rush-Copley diagnosed Plaintiff with an adjustment disorder with depressed mood. Plaintiff complained of feeling sad, tearful and anxious, and said that she wanted "time off to recover." The doctor prescribed Effexor and counseling at the "Mercy Center." (R. 168.) At a follow-up examination on May 6, 2005, the doctor advised Plaintiff to maintain a safe environment for herself and her daughter. (R. 167.) Shortly thereafter, on May 13, 2005, Plaintiff started seeing Dr. Kishwar Ali on a monthly

basis for psychiatric treatment. (R. 161.) The record does not contain Dr. Ali's treatment notes.

Plaintiff last reported to Rush-Copley on July 11, 2005, complaining of high blood pressure and a throbbing headache. The doctor increased her dosage of Toprol, put her on Norvasc (for high blood pressure), and gave her Tylenol. (R. 166.) In August 2005, Plaintiff obtained notes from Dr. Khawaja and Dr. Ali stating that she "needs to be on disability." Neither doctor provided any explanation for this assessment. (R. 160.)

On February 8, 2006, Dr. Ali completed a Psychiatric Report on Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 161-64.) Dr. Ali noted Plaintiff's history of depression, anxiety, insomnia, stress eating and crying spells, but stated that she was able to care for herself. Dr. Ali found Plaintiff to have a depressed mood and constricted affect, but observed that she spoke clearly and had logical thought process. (R. 161-62.) In Dr. Ali's view, Plaintiff suffered from bipolar disorder but could manage her own funds. (R. 164.) There is no evidence of further treatment with Dr. Ali after this date.

The following month, on March 20, 2006, Dr. C.J. Wonais conducted a consultative examination of Plaintiff for DDS. (R. 182-83.) Plaintiff told Dr. Wonais that she continued to experience chest pain that he described as "retrosternal and non-radiating." Dr. Wonais noted that the January 2005 stress test was normal, and confirmed she was taking Lexapro (for depression), Ambien (for sleep), Hyzaar, aspirin, Plavix, Xanax and Lorazepam (for anxiety), Norvasc, Prevacid, Toprol, Zocor and nitroglycerin. (R. 182.) Dr. Wonais diagnosed hypertension, history of myocardial infarction (status post angioplasty with stent), hyperlipidemia and depression. (R. 183.)

On or about April 28, 2006, Dr. Ravikiran N. Tamragouri sent DDS an undated note stating that Plaintiff could not undergo another stress test at that time due to very high blood pressure. Dr. Tamragouri indicated that Plaintiff might be capable of a stress test in the future, once her blood pressure was under control. (R. 209-10.) On May 22, 2006, Erika B. Altman, Ph.D., completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Plaintiff for DDS. (R. 211-28.) Dr. Altman found Plaintiff to have mild restrictions in her activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 221.) She was not, however, significantly limited with respect to understanding and memory, social interaction, or adaptation, and was only moderately limited in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances. (R. 225-26.)

On June 15, 2006, Dr. Virgilio Pilapil, a non-examining state agency consultant, completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. 229-36.) Dr. Pilapil opined that Plaintiff could frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. (R. 230.) Plaintiff had no additional postural, visual, or environmental limitations, and Dr. Pilapil found her capable of performing sedentary work. (R. 231-33, 36.) Dr. Reynaldo Gotanco affirmed Dr. Pilapil's assessment in October 2006. (R. 249-50.)

### 3. 2008

There is no evidence that Plaintiff received further treatment until January 2008, when she started going to Aunt Martha's Health and Outreach Center ("Aunt Martha's"). (R. 251-60.) Between January 3 and 24, 2008, Plaintiff had a pap smear and a pelvic

ultrasound, and complained of irregular menstruation.  She also had some blood work analyzed.  (R. 254-60.)  On May 27, 2008, Plaintiff underwent Doppler testing at Provena Mercy Medical Center.  (R. 262.)  The Doppler report showed 57.3% stenosis in the right common carotid artery with 50.6% stenosis in the right internal carotid artery, 40.3% stenosis in the left common carotid artery and 32.4% stenosis at the bulb level in the left carotid artery, and antegrade flow in both vertebral arteries.  (*Id.*)  The last record available is from June 11, 2008, when Plaintiff returned to Aunt Martha's for a follow-up examination related to her irregular menstruation. (R. 253.)

## B.     Plaintiff's Testimony

At the November 8, 2008 hearing, Plaintiff testified that she had an angioplasty and stenting in 2002 but continued to work until April 2005, when she took a leave of absence due to depression.  Plaintiff confirmed that she had not taken any depression medication since early 2006, but said that she continues to experience chest pain about twice a week. (R. 20-21, 24-26.)  The chest pain occurs when she over-exerts herself, lifts something heavy or feels stress.  Plaintiff stated that the pain normally subsides on its own within 5 to 15 minutes, but that about once every two weeks she has to use her nitroglycerin spray. (R. 25-26.)

With respect to her medical treatment, Plaintiff explained that she did not have health insurance but sought medical care at the free clinic (Aunt Martha's).  In or about May 2008, Plaintiff obtained a temporary county medical card and had a Doppler test showing 57.3% stenosis, 50.6% stenosis, 40.3% stenosis 32.4% stenosis in various of her carotid arteries.  Dr. Khawaja told Plaintiff that there was no need for an angioplasty or stenting until the blockage in her carotid arteries reached 75%.  (R. 28-29.)  Plaintiff's medical card

expired after one or two months, but she continued to obtain treatment at Aunt Martha's, where patients pay only if they can.  (R. 35)

Plaintiff testified that she does housework, cooks and cleans when she feels like it, shops for groceries, drives, plants flowers with her ex-husband's help, and occasionally babysits her young grandchildren.  (R. 19-20, 22-23.)  Once or twice a week, she wakes up exhausted and does not dress or leave the house, but just naps.  (R. 29.)  Plaintiff stated that normally she can only walk one block before getting tired or short of breath, she has a hard time with stairs, and she cannot stand for more than half an hour to an hour at a time.  She also testified that she cannot lift anything over 10 pounds, though "[f]or the most part," sitting is okay.  Despite Plaintiff's heart condition, she smokes a pack of cigarettes per day.  (R. 22, 33-34, 36.)

## C.    Medical Expert Testimony

Dr. Slodki testified at the hearing as an ME.  He confirmed that Plaintiff was taking a variety of medications at that time, including aspirin, Plavix, Norvasc, Prevacid, Toprol, Lipitor, nitroglycerin spray and pill, and Quinapril (for high blood pressure).  (R. 37-38.)  He also opined that these medications are appropriate for Plaintiff's hypertension and coronary artery disease.  (R. 39.)  The ME found it significant that Plaintiff's stress tests were all "almost identical in terms of performance," showing that she can last for seven minutes on a treadmill.  These results placed Plaintiff outside the range of any Listing.  (R. 39-40.)  With respect to Plaintiff's carotid artery stenosis, the ME agreed with Dr. Khawaja's assessment that the blockage would need to reach more than 75% before Plaintiff would require any surgical intervention or stenting.  (R. 41.)

**D. Vocational Expert Testimony**

Mr. Pagello testified at the hearing as a VE. He concluded that Plaintiff cannot return to her past work as an apheresis technician because as performed, the job sometimes requires medium or even heavy exertion, such as when a patient faints and needs assistance. (R. 46.) The VE testified that an individual who can stand for 6 hours out of an 8-hour workday and lift up to 10 pounds could work as a hostess (7,200 jobs available in the Chicago Metropolitan area) or an usher (1,200 jobs available). (R. 46-47.) Such an individual could also perform the full range of sedentary jobs. (R. 47.) If, however, the person would miss 1 3/4 days of work per month, then she would be unemployable. (R. 48.)

**E. The ALJ's Decision**

The ALJ found that Plaintiff's status post myocardial infarction, angina, hypertension, coronary artery disease and depression are severe impairments, but that they do not meet or equal those listed in the Social Security Regulations. (R. 10.) The ALJ determined that Plaintiff cannot perform her past work as an apheresis technician, but that she retains the residual functional capacity ("RFC") to perform the full range of sedentary work. (R. 11, 13.)

In reaching this conclusion, the ALJ considered in detail all of Plaintiff's medical records and the hearing testimony. (R. 11-13.) He accepted that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," but found her statements concerning the intensity, persistence and limiting effects of those symptoms not entirely credible. (R. 11.) The ALJ noted that following Plaintiff's angioplasty and stenting, angiograms showed no signs of significant blockage. (*Id.*) In addition, a chest x-ray from

April 6, 2005 was unremarkable, a 2005 stress test was normal, and the May 2008 Doppler report did not show blockage requiring surgical intervention. (R. 11-12.)

The ALJ indicated that the March 20, 2006 consultative examination was necessitated by a general lack of medical evidence in the record, which stemmed from the fact that Plaintiff did not have medical insurance. Nevertheless, Plaintiff underwent a Doppler test more than two years later in connection with her visits to a free clinic. (R. 12.) As for the August 2005 notes from Dr. Khawaja and Dr. Ali stating that Plaintiff needs to be on disability, the ALJ found it significant that Plaintiff had not seen either doctor since early 2006, and that both notes were conclusory with no explanatory detail. (*Id.*)

The ALJ accepted Dr. Pilapil's finding that Plaintiff can frequently lift up to 10 pounds and sit for 6 hours in an 8-hour workday, and agreed with the ME that Plaintiff's uncontrolled blood pressure would limit her to sedentary work. (R. 12-13.) Given her ability to perform the full range of sedentary work, the ALJ found that Plaintiff is "not disabled" in accordance with Grid Rule 201.25. (R. 14.)

## DISCUSSION

### A.  Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by substantial

evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

## B. Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. 42 U.S.C. § 423(d); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.*; *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *14 (N.D. Ill. Sept. 16, 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the

11

claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.     Analysis**

Plaintiff's sole argument in support of her motion for a remand is that the ALJ erred in failing to order a supplemental consultative examination.  An ALJ "is not *required* to order [consultative] examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient."  *Skinner*, 478 F.3d at 844 (emphasis in original).  An ALJ does have a duty to develop a full and fair record, but "the claimant is responsible for providing medical evidence of h[er] disability."  *Caine v. Astrue*, No. 08 C 50103, 2010 WL 4627718, at *13 (N.D. Ill. Nov. 3, 2010) (citing *Howell v. Sullivan*, 950 F.2d 343, 349 (7th Cir. 1991)).

Plaintiff does not dispute that the ALJ considered all of the available medical evidence in determining her RFC, including the consultative examination she had in March 2006.  Instead, Plaintiff claims that the record was deficient and required evidence from a second consultative examiner because she could not afford to keep receiving treatment after 2006.  Plaintiff notes that in August 2005, Dr. Khawaja and Dr. Ali both stated that she "needs to be on disability," yet she stopped seeing both treaters in early 2006.  She also stresses the ME's testimony that he could not comment on the cause of her continuing complaints of chest pain without a recent angiogram or stress test.

As a preliminary matter, the ALJ fairly rejected both Dr. Khawaja's and Dr. Ali's conclusory opinions as inconsistent with the medical records and not reflective of more recent clinical findings.  Plaintiff's stress test results from June 2002, October 2002, September 2003 and January 2005 were all normal, and an April 2005 EKG and chest x-

ray were unremarkable. On April 15, 2005, Dr. Khawaja examined Plaintiff and described the results as "totally unremarkable." In February 2006, Dr. Ali reported that despite having a depressed mood and constricted affect, Plaintiff spoke clearly, had logical thought process, and could manage her own funds. In addition, a May 2008 Doppler test showed insufficient blockage to warrant surgical intervention.

Plaintiff herself testified that notwithstanding continuing chest pain and sadness, she is able to do housework, cook and clean, shop for groceries, drive, help plant flowers and occasionally babysit her young grandchildren. She stopped taking antidepressants in early 2006, can lift up to 10 pounds, and stated that for the most part, sitting is okay for her. On these facts, the ALJ reasonably discounted the August 2005 doctors' notes, which contained no explanatory information whatsoever. *See Grieves v. Astrue*, No. 07 C 4404, 2008 WL 2755069, at \*20 (N.D. Ill. July 11, 2008) (a claimant "is not entitled to benefits merely because her treating physician said that she is disabled or unable to work."); *Bryant v. Astrue*, No. 4:08-CV-75, 2010 WL 1781105, at \*13 (N.D. Ind. Apr. 30, 2010) (ALJ properly rejected treating physician's conclusory notes regarding the claimant's ability to work). *See also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.")

As for Plaintiff's assertion that she stopped receiving treatment due to a lack of health insurance, the claim rings hollow given that she sought and obtained treatment at a free clinic in 2008. From January through June 2008, Plaintiff had a pap smear, pelvic ultrasound and blood analysis at Aunt Martha's, as well as a Doppler test. This belies Plaintiff's claim that she lacked access to medical care. *See, e.g., Sienkiewicz v. Barnhart*,

409 F.3d 798, 803-04 (7th Cir. 2005) (plaintiff's complaints of disabling symptoms were not credible where she failed to seek regular treatment). *See also Craft*, 539 F.3d at 679 ("[I]nfrequent treatment . . . can support an adverse credibility finding where the claimant does not have a good reason for the . . . infrequency of treatment.")

Nor is the court persuaded that the ALJ was somehow required to order a consultative examination based on the ME's statement that Plaintiff's ongoing chest pain "may or may not be due to her coronary artery disease," and that he would have no way of knowing whether there had been a recurrence. (R. 42.) As noted, Plaintiff bears the burden of providing medical evidence to substantiate her assertion of disability. *David v. Barnhart*, 446 F. Supp. 2d 860, 871 (N.D. Ill. 2006). Plaintiff was at all times represented by counsel, but she never suggested that the ALJ needed to obtain additional tests or records. *Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1031 (N.D. Ill. 2009) (quoting *Ray v. Bowen*, 843 F.2d 998, 1006 (7th Cir. 1988)) ("Where, as here, an applicant for disability benefits is represented by counsel, the ALJ is 'entitled to assume that the applicant is making [her] strongest case for benefits.'") Moreover, Plaintiff routinely complained of chest pain from 2002 to early 2005, but her four stress tests from that time period were all unremarkable. Plaintiff offers nothing to suggest that another stress test would produce different results. To the contrary, the May 2008 Doppler test showed blockage well below that required for surgical intervention.

The Seventh Circuit has recognized that "one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on." *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994) (quoting *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993)). Given the

difficulty of having a "complete" record, courts "generally respect the Secretary's reasoned judgment" regarding the amount of evidence to gather. *Id. See also Tally v. Barnhart*, No. 05 C 4616, 2007 WL 1238913, at *15 (N.D. Ill. Apr. 26, 2007). In this case, the ALJ reasonably concluded that he had sufficient information to determine whether Plaintiff is disabled, and his RFC assessment is consistent with all of the medical and testimonial evidence of record. The ALJ's decision is supported by substantial evidence and is affirmed.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 17] is denied. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: November 29, 2010

_____
SHEILA FINNEGAN
United States Magistrate Judge